IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDREW L. MAINE,

     Plaintiff,

v.

ALEX AZAR,

     Defendant.

Civil Action No.: GLR-16-3788

## **MEMORANDUM OPINION**

THIS MATTER is before the Court on a Motion to Dismiss Amended Complaint
or, in the Alternative, for Summary Judgment by Defendant Alex Azar, Secretary of the
United States Department of Health and Human Services (ECF No. 43).[1] The Motion is
ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For
the reasons set forth below, the Court will grant in part and deny in part the Motion, which
it construes as a motion for summary judgment.

---

[1] Also pending before the Court is Plaintiff Andrew L. Maine's Motion to Strike
Defendant's Reply Exhibits (ECF No. 50). In the Motion, Maine urges the Court to strike
from the record an email chain and deposition excerpt attached to the Agency's Reply in
Support of its Motion to Dismiss or for Summary Judgment. Because the Court does not
rely on these exhibits in reaching its decision on the Agency's dispositive motion, the Court
will deny Maine's Motion to Strike.

# I.    BACKGROUND[2]

## A.    <u>Relevant Facts</u>

Plaintiff Andrew L. Maine, who is Black and Jamaican, has worked for the National Institutes for Health ("NIH"), a sub-agency within the United States Department of Health and Human Services ("HHS" or the "Agency"), since 2007. (Am. Compl. ¶¶ 4, 6, 12, ECF No. 42). At the time of the events at issue in this case, Maine was employed as a GS-13 level employee in NIH's Office of Acquisitions ("OA"). (<u>Id.</u> ¶ 12). The OA is a sub-office within NIH's Office of Logistics and Acquisition Operations ("OLAO"), which is part of the Office of Acquisitions and Logistics Management ("OALM"). (<u>Id.</u> ¶ 14). During his employment with NIH, Maine has initiated several Equal Employment Opportunity ("EEO") complaints relating to conduct by his supervisors, including complaints in 2008, August 2013, August 2014, and August 2016. (<u>Id.</u> ¶¶ 14, 108–10; Joint Mot. Ext. Time ¶¶ 3–4, ECF No. 6).

Maine's fifty-page Amended Complaint sets forth numerous allegations against his OLAO supervisors that span the course of nearly seven years. Maine asserts most of his allegations against Brian Goodger, Maine's second-level supervisor, who, according to Maine, harbors an animus against Maine for his prior EEO activity, his national origin, and his race. (<u>See</u> Am. Compl. ¶¶ 186, 189–90, 192). Maine further alleges that his other supervisors—namely, Gregory Holliday, Wanda Russell, and Susan Cortes-Shrank—have

---

[2] Unless otherwise noted, the Court takes the following facts from Maine's Amended Complaint and accepts them as true. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (citations omitted).

"buttressed Goodger's agenda" through their own discriminatory and retaliatory actions. (See id. ¶ 187). Before addressing the substance of his claims, the Court will summarize Maine's allegations.

### 1.   Transfer to Gaithersburg Warehouse

In August 2012, Brian Goodger, who is white and "American-born," stated that he was going to detail Maine to contracting specialist duties at OLAO's warehouse in Gaithersburg, Maryland, known as the Gaithersburg Distribution Center ("GDC"). (Id. ¶¶ 17, 22, 25). At that time, Maine had worked at NIH's Rockville office for four years. (Id. ¶ 33). Although Maine objected, Goodger moved forward with the detail, assigning Maine to a GS-1102-13 position supporting contracting specialist duties at GDC. (Id. ¶¶ 23, 25).

At some point after his detail to GDC, Goodger asked Karen Thomas, NIH's Director of the Administrative Program Resources Office ("APRO"), if there was anything in Maine's 2009 EEO settlement[3] that precluded assigning him to GDC permanently. (Id. ¶ 27). After Thomas informed Goodger that Maine's prior EEO settlement did not preclude reassignment to GDC, Goodger initiated Maine's permanent reassignment in July 2013. (Id. ¶ 28). Goodger informed Maine about his reassignment to GDC during a meeting on July 18, 2013. (Id. ¶ 29). Maine voiced his objection to the assignment, but was nonetheless permanently reassigned to the contract specialist position at GDC. (Id.).

_____

[3] Maine had previously filed an EEO complaint alleging that Gregory Holliday, his supervisor in OA, and Diane Frasier, the director of OALM, discriminated against him on account of his national origin by falsifying his 2007 performance appraisal. (Am. Compl. ¶ 14). This EEO complaint was settled in 2009. (Id.).

Upon his reassignment, Maine's job duties became what he characterizes as "menial." (Id. ¶ 32). Maine also asserts that his assignment to GDC meant he separated from his coworkers on the OLAO/OA Team 3, who continued to work from NIH's Rockville office. (Id. ¶¶ 33, 37). Additionally, although the other Team 3 members reported to their team leader, Brendan Miller, Maine continued to report to Wanda Russell, who stayed in OLAO at the Rockville office. (Id. ¶ 38). Maine also states that although he was permitted to work on a "flex-time" policy at the Rockville office, his flex-time schedule was canceled upon his reassignment to GDC. (Id. ¶¶ 89–90).

Maine alleges that subsequent to his transfer to GDC, his supervisors failed to provide him with the training and resources required to do his job. (Id. ¶ 35). In particular, Maine states that his supervisors refused to provide him training in the NBS PRISM system, the computer system and program used for processing GDC requisitions. (Id.). Maine repeatedly asked for permission to take the NBS PRISM course, but Goodger denied Maine's requests, stating that there was a $750 training cost limit per employee and that NIH did not have the funds to provide the required training. (Id. ¶¶ 43, 45).

Additionally, Maine states that Goodger provided him "a non-functioning computer" when he arrived at GDC. (Id. ¶ 37). As a result, Maine contends that he was unable to complete certain trainings; did not have access to Microsoft Outlook or Microsoft Office Suite, which forced Maine to access his email through the "less efficient" web portal; and did not have access to the shared "L drive," which is where NIH stores files needed for processing requisitions. (Id. ¶ 39). According to Maine, NIH did not provide

4

him with a working computer at GDC until January 2015, meaning that he was without a properly functioning computer for more than one-and-a-half years. (Id. ¶¶ 39, 40).

Maine also alleges that his office at GDC had "sub-standard" furniture that was "so broken it cut his skin and ripped his clothes." (Id. ¶¶ 37, 47). Maine was subsequently moved to a cubicle in GDC that was a "stand-alone room at the back of [GDC], away from co-workers and customers" that "had a loud buzzing noise and exposed wires running across the floor." (Id. ¶ 48). Maine tripped over the exposed wires on two occasions, which aggravated existing medical conditions in his shoulders and feet. (Id.).

### 2.    Disciplinary Actions in 2013–2015

Following the meeting on July 18, 2013, during which Goodger informed Maine about his reassignment to GDC, Maine was "so upset and distraught that he needed several days off." (Id. ¶ 53). Maine was subsequently absent from work on July 19, July 22 through July 24, and July 29 through July 31, 2013. (Id.). Maine informed Russell about his absences and asked if he needed to submit medical documentation to her, given that he had not been required to provide a doctor's note on previous occasions when he was absent for surgery. (Id. ¶ 54).[4] Maine states that he had a doctor's note for his absences but was unsure about who should receive such documentation. (Id.). Nonetheless, Russell put Maine on Absent Without Leave ("AWOL") status for those absences for his failure to provide a doctor's note. (Id.).

---

[4] Evidence in the record shows that Russell contacted Maine asking for medical documentation, not vice versa. (See Russell-Maine July 24, 2013 Email ["July 24, 2013 Email"] at 1, ECF No. 43-11).

In August 2013, Russell issued a Letter of Warning to Maine for his failure to attend a June 2013 meeting with Russell and Goodger to discuss Maine's May 2013 financial report for OLAO. (Id. ¶ 56). According to Maine, after Goodger suggested by email that Maine had "done something wrong," Maine asked to "have a neutral third party present" at the meeting. (Id.). Goodger denied Maine's request. (Id.). Maine then indicated he was willing to attend the meeting without a third-party present, but Goodger never informed Maine about the time and place of the meeting. (Id.). Maine states Russell issued the letter at Goodger's insistence. (Id.).

On September 30, 2013, Russell issued Maine a Letter of Reprimand for his failure to process certain GDC requisitions that had been assigned to him in August 2013 shortly after his reassignment. (Id. ¶ 57). According to Maine, Russell, Goodger, and Thomas were aware that Maine had not received the training he needed and did not have a functioning computer to access the NIH email, online trainings, or the NBS PRISM system. (Id.).

On February 12, 2014, Russell proposed a seven-day suspension for Maine because he had failed to complete an online ethics training course by December 31, 2013. (Id. ¶ 58). Maine responded by pointing out that he could not complete the course on time because he did not have a functioning computer. (Id.). Maine also provided attachments showing that, as of January 15, 2014, he was still waiting for the Information Technology ("IT") Service Desk to fix his computer, and that he completed the ethics training on January 24, 2014 once the issue was resolved. (Id.). Still, Goodger issued his decision imposing the seven-day suspension on March 21, 2014. (Id.). Russell had apparently spoken with Goodger before she issued the proposal to suspend, and Goodger indicated that he wanted Maine to

be suspended. (Id.). By contrast, two other OA employees who failed to timely complete the ethics course were not disciplined.[5] (Id.). Maine lost pay and benefits as a result of the suspension. (Id.).

On August 12, 2014, Russell proposed a fourteen-day suspension for Maine's failure to process certain assigned requisitions. (Id. ¶ 59). Like the previous suspension, Russell discussed the proposed suspension with Goodger in advance. (Id.). Through counsel, Maine responded that NIH had an obligation to provide him with training and reiterated the issues concerning his defective computer equipment. (Id.). Goodger imposed the suspension on December 12, 2014, once again causing Maine to lose pay and benefits. (Id.).

On August 28, 2015, Russell proposed a second fourteen-day suspension for Maine's failure follow his supervisor's instructions about including Chris Major, NIH's Director of Human Resources, on emails. (Id. ¶ 60). Maine had previously included Major on several emails in which he raised questions about "the processing of the rebuttal he had written to his unsatisfactory 2014 PMAP performance rating" and "an SF-50 form, signed only by Chris Major, cancelling Mr. Maine's within-grade increase and containing the cryptic remark 'ER Case' as the reason for the cancellation." (Id.). After receiving the proposed suspension, Maine also asked Russell whom he should contact about relevant

---

[5] For her part, Russell stated to the EEO investigator that another employee failed to complete the training by December 23, 2013, but that employee promptly completed the training after receiving a reminder from Russell that day. (2d Suppl. Russell Aff. at 3, ECF No. 43-28). As such, Maine was the only employee for whom Russell is responsible who did not complete the training by December 31, 2013. (Id.).

personnel issues. (Id. ¶ 61). Russell responded on September 2, 2015 with a list of such individuals, which Maine had not been given previously. (Id.). Goodger imposed the second fourteen-day suspension on October 6, 2015, even though Goodger admitted he did not know what the "ER Case" remark meant and did not consult with Major before issuing the decision. (Id. ¶ 62). As a result of this suspension, Maine lost pay and benefits. (Id. ¶ 62). In total, Maine lost pay and benefits for five weeks as a result of these disciplinary actions. (Id. ¶ 64).

### 3.    Performance Reviews in 2013–2015

Maine asserts he that he should have received a "closeout" Performance Management Appraisal Plan ("PMAP") rating for his prior GS-0343-13 position as well as a PMAP for his new position within thirty days of his reassignment to GDC, but he did not receive either of these documents in the time required. (Id. ¶¶ 37, 65). Additionally, Maine asserts that Russell falsely claimed she had sent him a draft 2013 PMAP on March 22, 2013, even though he did not receive the draft until May 24, 2013. (Id. ¶ 66). According to Maine, Russell also gave him "essentially generic" PMAP performance plans for his GS-1101-13 position at GDC, which did not reflect the duties he was actually assigned to do. (Id. ¶ 67). As a result, Maine objected to these PMAPs. (Id.).

On or about June 4, 2014, Russell gave Maine a negative progress review for 2014, indicating that he refused to take necessary training and failed to process GDC requisitions. (Id. ¶ 68). Maine objected to this performance review, noting that he had not refused to take training; rather, Maine had taken many training courses that had been recommended or approved by Russell. (Id.). Maine had also applied to take the NBS PRISM course

pursuant to Russell's instructions, but Goodger did not approve the request. (Id.). In addition, Maine's computer was still not working properly at the time, and he was waiting for delivery and set-up of a new computer. (Id.).

Russell ultimately issued Maine an unsatisfactory PMAP performance rating on February 20, 2015. (Id. ¶ 69). Russell did not give Maine the rating until May 4, 2015. (Id.). Russell also did not meet with Maine to give him his 2014 rating. (Id.). Maine gave Russell a "lengthy rebuttal" to his 2014 PMAP rating "with a large number of exhibits attached." (Id. ¶ 70). Russell met with Maine on September 14, 2015 to discuss his rebuttal. (Id.). Russell subsequently revised Maine's PMAP narrative to indicate he had completed his training, but did not change his unsatisfactory rating. (Id.).

According to Maine, Russell has acknowledged that Maine has been processing his assigned requisitions since receiving training from Team 3 Leader Brendan Miller in January 2015. (Id. ¶ 71). Russell gave Maine a satisfactory PMAP performance rating for 2015. (Id.). Nonetheless, Maine contends his rating should be higher "because he is doing everything he is asked to do and, given his location and assignments, he has no opportunity to do anything more than that." (Id.).

### 4.    Denial of 2014 Promotion

In February 2014, NIH advertised the position of GS-1102-14 Supervisory Contract Specialist. (Id. ¶ 72). The position did not require prior supervisory experience or a master's degree. (Id.). According to Maine, the listing was "for the position of Team 4 Leader in OA, which handles Special Contracting, including Indefinite Delivery-Indefinite Quantity ("IDIQ") contracts." (Id.).

Gregory Holliday and Carol Marcotte, OA's director and deputy director, respectively, conducted the initial round of interviews. (Id. ¶ 74). Although 110 people applied for the position, only fifty-one people, including Maine, made the "Certification List." (Id.). Goodger, Holliday, and Marcotte then determined the top ten applicants. (Id.). Holliday and Marcotte interviewed nine of these applicants, including Maine. (Id. ¶ 75). According to the scoring sheets for the position, Marcotte gave Maine the second highest score, tied with another person. (Id.). Marcotte recommended Maine for a second interview by Goodger, who was the "selection official" for the position. (Id. ¶¶ 74, 75). Holliday gave three applicants the highest score and three others, including Maine, the second highest score. (Id. ¶ 75). Holliday did not make recommendations about second interviews for any of the applicants. (Id.).

Goodger interviewed five of the nine applicants, including some with lower scores than Maine, but did not interview Maine for the position. (Id. ¶ 76). Goodger ultimately selected Susan Cortes-Shrank, whom Maine describes as "an American-born female with no prior EEO activity." (Id.). Maine alleges that Goodger's "explanations regarding his GS-14 selections are highly questionable" and "are contradicted by the other participants and relevant documents." (Id. ¶ 78).

### 5. Continued Denial of Training & Other Opportunities

On or about May 24, 2016, Maine applied for a Simplified Acquisitions & Delegated Procurement (NBS-NIHTC9513) course. (Am. Compl. ¶ 97). The training, which was set to take place on August 25, 2016 and October 31, 2016, cost around $1,649. (Id.). According to Maine, the training was an integral part of his new assignment because

without the training, he could not ascertain his duties and work responsibilities. (<u>Id.</u> ¶ 98). Russell had initially instructed Maine to take the training, and the majority of employees in Maine's series[6] had already taken the training. (<u>Id.</u> ¶ 99). However, on June 10, 2016, Goodger informed Maine that his request to take the training course was denied. (<u>Id.</u> ¶ 100). Maine applied for the course again on August 19, 2016, but his request was once again denied. (<u>Id.</u> ¶¶ 101–02). Other work-related training that Maine had requested was also denied even though, according to Maine, the training was necessary for his new position. (<u>Id.</u> ¶¶ 102–03). Maine alleges that his supervisors denied his requests for training "to keep Mr. Maine in an unsuitable position well below his abilities, and to stifle any possibility of advancement." (<u>Id.</u> ¶ 104).

On or about July 7, 2016, Maine submitted an "unlimited warrant application package." (<u>Id.</u> ¶ 105).[7] Even though Maine was qualified for an unlimited warrant application, he did not receive approval or denial with respect to the application and never received an explanation for why he was not approved. (<u>Id.</u>). On or about December 1, 2016, Maine submitted a Contracting Officer's "Unlimited Warrant Application" to Holliday for review and approval. (<u>Id.</u> ¶ 117). Holliday approved the application the same day. (<u>Id.</u>). On or about January 12, 2017, however, Maine "received an approved Contracting Officer's

---

[6] Federal government positions are classified into occupational "series." <u>Frequently Asked Questions (FAQ) About Government Contracting Careers</u>, Fed. Acquisition Inst., https://www.fai.gov/sites/default/files/Questions_for_new_contacting_professionals.pdf (last visited Aug. 9, 2021) (hereafter, "FAI FAQ"). Contracting officers and contracting specialists like White are in the "Contracting Series, 1102." <u>Id.</u>

[7] A warrant "allows [a contracting officer] to negotiate on behalf of the United States Government." <u>See</u> FAI FAQ at 1. Thus, an unlimited warrant would allow Maine to obligate the government without limitation as to the size of the contract.

Warrant in the amount of Not to Exceed $10 million in value," which was less than the value Maine had requested. (Id. ¶ 118). According to Maine, he is qualified for an "Unlimited Contracting Officer's Warrant," which "would also be instrumental to Mr. Maine's growth potential and marketability." (Id.).

On or about March 3, 2017, Maine requested the opportunity to attend Leadership Excellence in Acquisitions training. (Id. ¶ 130). Although Maine provided all of the information on time, Holliday failed to approve Maine's request by the time the training began and, as a result, Maine lost his ability to attend the training. (Id. ¶¶ 130–31).

### 6.     Request for Reassignment to NITAAC

On or about March 15, 2017, Maine requested a reassignment to the NIH Information Technology Acquisition and Assessment Center ("NITAAC"). (Id. ¶ 132). According to Maine, his qualifications for any of the most complex contracting specialist positions are equal to, or exceed, those of most employees occupying such positions. (Id. ¶ 134). Nonetheless, on March 16, 2017, Goodger denied Maine's request for reassignment, explaining that Maine was needed in his current position. (Id. ¶¶ 133, 135).

### 7.     Non-Selection for 2017 & 2018 Positions

On or about October 27, 2017, Mr. Maine applied for a Supervisory Contract Specialist position, GS-110214, as a thirty percent or more disabled veteran. (Id. ¶ 146). The job announcement opened on October 23, 2017, and closed on October 30, 2017. (Id. ¶ 147). On or about December 11, 2017, Maine was notified that he was eligible and was referred to the hiring manager. (Id. ¶ 148). On or about July 26, 2018, Maine was notified

by the USA Staffing Office that he had not been selected for the position. (Id. ¶ 149). Maine had not, however, been interviewed for the position. (Id.).

On or about April 2, 2018, Maine applied for another Supervisory Contract Specialist position, GS-110214. (Id. ¶ 150). The job announcement opened on April 3, 2018, and closed on April 6, 2018. (Id. ¶ 151). On or about April 6, 2018, Maine was notified that he was eligible and was referred to the hiring manager. (Id. ¶ 152). On or about August 20, 2018, Maine was notified by the USA Staffing Office that he had not been selected for the position. (Id. ¶ 153). Once again, Maine had not been interviewed for the position. (Id.).

### 8.     Performance Evaluations for 2016–2018

Maine alleges that his mid-year review for 2016 was "incomplete" because Russell was "decidedly unprepared, and often strayed from the purpose of the meeting" when they met to discuss his performance review. (Id. ¶ 106). Additionally, although "Russell agreed to look at the inaccuracies that Mr. Maine pointed out to her" and send Maine a copy of his PMAP, Maine never received a copy of the PMAP for his review or signature. (Id. ¶ 107). Maine alleges that he notified his supervisors on numerous occasions, including on October 3, 2016 and October 6, 2016, that he had not received a 2016 PMAP mid-year review. (Id. ¶ 128).

Maine also alleges that his 2016 PMAP, which he received from Holliday by email, only reflected an overall score of 3.4 even though he "should have been rated Exceptional/Outstanding in every category." (Id. ¶¶ 126–27). According to Maine, "there was a gap in Mr. Maine's immediate supervisory chain" between the time Russell retired

and Holliday was assigned as Maine's first-line supervisor. (Id. ¶ 127). Thus, "Holliday was clearly unfamiliar with Mr. Maine's accomplishments" when completing Maine's evaluation. (Id.). Additionally, "despite Mr. Maine's continuous accomplishments, Holliday disingenuously complained that Mr. Maine had not written enough concerning his accomplishments." (Id.). According to Maine, "Holliday took advantage of the generic nature of the PMAP to give Mr. Maine less than a full and proper evaluation." (Id.).

Maine alleges he "received a non-specific PMAP for 2017, which does not allow for a fair and proper evaluation." (Id. ¶ 120). Additionally, his "2017 PMAP plan included areas of work that Mr. Maine was not doing" and did not include the "menial" assignments Maine had been assigned. (Id. ¶ 121). According to Maine, up until and through this time, his assignments "continue[d] to be well below his grade level and qualifications," "underutilize[d] his skills," and "decrease[d] his marketability." (Id. ¶ 122).

Maine received his 2018 Performance Management Appraisal Plan via telephone on or about February 14, 2019. (Id. ¶ 163). Maine did not receive a copy of his PMAP to reference during the telephone call. (Id.). Maine received a score of "3" in every single category, resulting in an overall rating of "3." (Id.). Maine contends that "[t]his rating is . . . entirely contrary to the ratings that Mr. Maine had received before the discrimination and retaliation against him began." (Id.). Maine also states that the underlying reasons for this assessment were "patently false, and contrary to Mr. Maine's experiences with his customers with respect to customer service." (Id.). Maine states that Management's rating of "3" with respect to professional development "is not only false, but based on the insidious assumption that Mr. Maine had somehow resisted training," when in fact Maine

"had continually requested training, and, most of the time, his requests for training had been denied." (Id. ¶ 164). Maine had also "continually maintained his FAC-C and FAC-COR Level III Certification, which is the highest-level certification possible," and "ha[d] been approximately six hours away from completing a [m]aster's degree in Procurement and Acquisition Management." (Id.). Additionally, Maine asserts he was "eligible and qualified for an Unlimited Contracting Officer's warrant, and he ha[d] applied for such a warrant on numerous occasions," but "his application[s] [were] denied or downgraded to a $10 Million Dollar Contracting Officer's Warrant" each time he applied. (Id.). Contrary to his performance evaluation, Maine contends he "diligently completes his work assignments, works independently and without errors," and "has maintained a high work ethic, even though he has been isolated and banished from the rest of his peers." (Id. ¶ 165).

### 9.    Harassment by Supervisors

On or about November 8, 2016, "Goodger and/or Holliday notified Mr. Maine that he would be reassigned effective November 13, 2016." (Id. ¶ 111). Around that time, Maine also learned that Russell had retired and Holliday was his new supervisor. (Id. ¶ 112). According to Maine, the assignment of Holliday as Maine's supervisor was discriminatory because "Maine had already filed an EEO Complaint against Holliday, of which Holliday was aware, and which included issues pertaining to Mr. Maine's PMAP Rating and denial [of] Promotion" and because "Holliday and Russell had sired a child together." (Id. ¶ 113). Holliday informed Maine "that he was assigning work to Mr. Maine" but was uncertain about "how [Holliday] was to receive such work assignments for Mr. Maine" and whether Maine "had been tasked with receiving all requisitions for Brendan Miller's team." (Id.

¶ 114). To the best of Maine's knowledge, "he is the only Contract Specialist, reporting directly to Holliday, whose work assignments are forwarded to him from one or more of his team leaders and/or designees." (Id. ¶ 115). Additionally, Maine alleges that "Holliday allowed lower-level, less educated, less qualified, less certified staff, as well as staff lesser to Mr. Maine, in terms of warrant level, to act in a quasi-supervisory capacity, while Mr. Maine has been denied his full potential." (Id. ¶ 125).

According to Maine, on or about July 18, 2018, Susan Cortes-Shrank, who was Maine's supervisor at the time, made false claims about his work in the presence of other employees while giving him his 2018 mid-year PMAP at GDC. (Id. ¶ 138). During his mid-year PMAP, Cortes-Shrank falsely asserted that Maine "was not working independently," despite evidence to the contrary "demonstrated by Mr. Maine's email correspondence with Cortes-Shrank, as well as by his work product." (Id.). According to Maine, "Cortes-Shrank continued to bully and harass" Maine during the performance review. (Id.). After Maine "asked [Cortes-Shrank] if she or anyone else had helped him with his work," she "responded by yelling at Mr. Maine, and did not answer the question." (Id.). Maine asserts "it was impossible for him to have a constructive PMAP Mid-Year Review" because of "Cortes-Shrank's discriminatory animus and undisguised hostility" towards him. (Id.).

Cortes-Shrank also yelled at Maine about a training that he did not attend. (Id. ¶ 139). When Maine asked her why he did not attend the training, Cortes-Shrank yelled at him again, "hurl[ed] invectives" at him, and "proclaimed that she was a Director, that she had numerous employees under her, and that Mr. Maine should know why he did not attend

16

the training." (Id.). According to Maine, Cortes-Shrank knew or should have known that Maine did not attend the training because he had been on sick leave, which Cortes-Shrank had approved. (Id.).

During his performance review, Maine asked Cortes-Shrank "to show him the purported emails concerning Mr. Maine's work product, to which Cortes-Shrank had alluded." (Id. ¶ 140). Cortes-Shrank "failed to do so" and when Maine "followed up by asking her to review her emails, she again yelled that she was the Director, and that Mr. Maine needed to read his emails." (Id.). According to Maine, he was "only requesting that Cortes-Shrank provide documentation with respect to her attacks upon him and upon his work product," but she "refused to refer to any evidence." (Id.).

Maine "suggested that they end the meeting" because it appeared that Cortes-Shrank and Maine had "reached an impasse." (Id. ¶ 141). Cortes-Shrank then, "at the top of her lungs, blurted out that she was only giving Mr. Maine a rating of three; and that he was lucky that she was even giving him that." (Id. ¶ 142). Cortes-Shrank "screamed at Mr. Maine in this manner at a table on the warehouse floor . . . even though contractor employees were walking around." (Id.).

On or about October 5, 2018, Maine attended a meeting with Cortes-Shrank and Holliday. (Id. ¶ 143). At the meeting, "Cortes-Shrank became angry with Mr. Maine, because she thought that Mr. Maine had filed an EEO complaint against her, at a time when he did not even know her." (Id. ¶ 144). Maine attempted to explain to her that he had not filed a complaint against her and that he did not know her at the time. (Id. ¶ 145). Maine was "therefore forced to explain to her that he had not filed a complaint against her directly;

but that, instead, he had filed a complaint primarily against Goodger," and that "Holliday could be a party" to that complaint. (Id.).

### 10.    AWOL in 2019

In January 2019, Cortes-Shrank informed Maine was informed that he was being placed on AWOL status for the period January 7, 2019 through January 9, 2019. (Id. ¶¶ 154, 158). According to Maine, he was absent "because of his misunderstanding of the Government Shutdown and its procedures during that period." (Id.). Management later reversed its decision on January 18, 2019 "because of pressure from other employees, who also misunderstood the ramifications of the Government Shutdown." (Id. ¶¶ 154–55). Maine contends the decision to place him on AWOL was "for discriminatory and retaliatory reasons" and caused him "a considerable amount of stress." (Id.).

### B.    Procedural History

On August 12, 2013, Maine contacted NIH's Office of Equity, Diversity, and Inclusion ("OEDI"), which commenced Agency Case No. HHS-NIH-OD-100-13 ("Case No. 100-13"). (Joint Mot. Ext. Time ¶ 3). About a year later, on August 29, 2014, Maine contacted OEDI regarding a second matter, which commenced Agency Case No. HHS-NIH-OD-98-14 ("Case No. 98-14"). (Id. ¶ 4). On April 16, 2015, Case No. 100-13 and Case No. 98-14 were consolidated for hearing before the Equal Employment Opportunity Commission ("EEOC"). (Id. ¶ 7). At the administrative level, the parties exchanged written discovery, produced more than 11,000 pages of documents, and participated in at least nine depositions. (Id. ¶ 8). Before the administrative judge entered a written decision, however, Maine requested that the consolidated cases be remanded to HHS. (Id. ¶ 9). HHS issued

18

Final Agency Decisions, or "Right to Sue" letters, on Maine's claims on August 24 and 26, 2016. (Am. Compl. ¶ 182). Maine received these decisions on August 29, 2016, and on August 31, 2016, respectively. (Id.).

Prior to receiving the Right to Sue letters, Maine initiated contact regarding another EEO complaint on August 9, 2016. (Id. ¶ 108). Maine continued to amend his complaint in a timely manner through April 4, 2017. (Id. ¶¶ 109–10).

Maine filed this lawsuit on November 22, 2016. (ECF No. 1). On April 7, 2017, Defendant moved for summary judgment in its favor. (ECF No. 8). On March 1, 2018, the Court denied Defendant's motion without prejudice "to give Maine the opportunity to properly support material facts with citations to the record instead" of relying on the allegations in his Complaint. (Mar. 1, 2018 Letter Order at 2, ECF No. 15).

On January 14, 2019 and March 15, 2019, upon Maine's request, the Court stayed this matter to permit Maine to secure new counsel. (ECF Nos. 32, 34). Maine's new attorney entered his appearance on April 7, 2019. (ECF No. 35).

At some point in early 2019, Maine moved to withdraw his request for a hearing before an EEOC Administrative Judge so that Maine could combine his claims in that case with the instant case. (Id. ¶ 183). On May 1, 2019, in response to Maine's motion, Administrative Judge David Norken dismissed Maine's combined cases (EEOC Case No. 531-201800313X and EEOC Case No. 531-2019-00343X) and remanded them to the Agency for a final decision. (Id.).

Maine filed an Amended Complaint on August 9, 2019. (ECF No. 42). Maine's four-count Amended Complaint alleges: retaliation in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") (Count I); discrimination based on national origin in violation of Title VII (Count II); and discrimination based on race in violation of Title VII (Count III).[8] (Am. Compl. ¶¶ 185–200). Maine seeks compensatory damages, a retroactive appointment to GS-14 with full back pay and benefits, front pay and future benefits, pre-judgment interest, attorneys' fees and costs, and removal of the unsatisfactory performance evaluation and disciplinary actions from his personnel file. (Id. at 49).

On October 23, 2019, Defendant filed its Motion to Dismiss Amended Complaint or, in the Alternative, for Summary Judgment. (ECF No. 43). Maine filed an Opposition on November 12, 2019. (ECF No. 46). Defendant filed a Reply on November 26, 2019. (ECF No. 49).

## II.    DISCUSSION

### A.    **Standard of Review**

#### 1.    **Conversion**

HHS styles its Motion as a Motion to Dismiss Amended Complaint or, in the Alternative, for Summary Judgment. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This

---

[8] Count IV of Maine's Amended Complaint is styled as a claim for "nonselection" in violation of Title VII based on his supervisors' failure to promote him under the 2017 and 2018 job vacancies. (See Am. Compl. ¶¶ 193–200). A failure to promote claim is not a standalone Title VII claim, but rather a type of adverse employment action that supports a claim for retaliation or discrimination. Accordingly, the Court will evaluate Maine's "nonselection" claim as part of its review of his other claims.

Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at \*5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for

discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

Here, substantial discovery has already taken place at the administrative level. Indeed, as the Agency points out, the EEOC investigations of Maine's numerous claims resulted in nearly 8,000 pages of materials, including sworn declarations, emails, Maine's performance evaluations, and deposition transcripts for ten witnesses. (See Def.'s Mem. Supp. Mot. Dismiss Am. Compl. Alt. Summ. J. ["Mot. Summ. J."] at 2 n.2, ECF No. 43-1; Def.'s Reply Mem. Supp. Mot. Dismiss Am. Compl. Alt. Summ. J. ["Reply"] at 2, ECF No. 49). Maine has not filed a Rule 56(d) affidavit explaining why additional discovery is needed, nor does he substantively respond to the Agency's argument that the Court should convert the Motion to one for summary judgment. And although Maine occasionally mentions in his Opposition that additional discovery is needed to, for example, depose

Cortes-Shrank or explore why the 2014 job vacancy was not advertised with a veteran's preference, (see, e.g., Pl.'s Mem. Opp'n Def.'s Mot. Dismiss Am. Compl. Alt. Summ. J. ["Opp'n"] at 16 n.17, ECF No. 46), he does not explain how this discovery would give rise to a genuine dispute of material fact. As such, Maine has not sufficiently demonstrated that additional discovery is needed in this case.

Separately, the Court rejects Maine's argument that the Agency's present Motion improperly seeks to relitigate issues already decided by the Court. Maine contends that the Court's Order denying without prejudice HHS's previous motion for summary judgment signaled that the Court "presumably did not view the portions of the administrative record, cited by both Parties, as a substitute for discovery in this case." (Opp'n at 2). This is not so. The Court denied the Agency's prior motion for summary judgment because it was unclear from the briefs whether there existed any genuine disputes of material fact and because it was appropriate "to give Maine the opportunity to properly support material facts with citations to the record instead [of the allegations in his Complaint]." (Mar. 1, 2018 Letter Order at 2). Maine later filed an Amended Complaint, giving the Agency the renewed right to move for dismissal or summary judgment. See, e.g., Bridges v. Keller, No. 1:10CV113, 2012 WL 3239774, at *4 (W.D.N.C. 2012) ("[T]he filing of the amended Complaint triggered once again the Defendants' procedural rights to move to dismiss the complaint."), aff'd, 519 F.App'x 786 (4th Cir. 2013). When the Agency did so, Maine chose once again to rely largely on the allegations in his pleadings rather than citing to evidence in the voluminous administrative record. At this stage, the Court will proceed to consider the evidence before it.

23

At bottom, in light of the substantial administrative record in this case, as well as Maine's failure to adequately demonstrate that additional discovery is needed, the Court will construe the Agency's Motion as a motion for summary judgment. See High v. Comm'r, Soc. Sec., No. SAG-18-3334, 2019 WL 5209613, at *6 (D.Md. Oct. 16, 2019) (citing, among other factors, "the degree of discovery already in the parties' possession" as a basis for conversion without permitting additional discovery).

## 2. Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material

fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 3.   Title VII Framework

Maine brings his retaliation and discrimination claims pursuant to Title VII. Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's anti-

25

retaliation provision forbids employer actions that "discriminate against" an employee because he has "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). At the summary judgment stage, a plaintiff may establish a Title VII claim "either 'through direct and indirect evidence of retaliatory [or discriminatory] animus,' or through a burden-shifting 'pretext' framework." Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018) (quoting Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015)).

"Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged [retaliatory] attitude, and (2) bear directly on the contested employment decision." Laing v. Fed. Exp. Corp., 703 F.3d 713, 717 (4th Cir. 2013) (internal quotation marks and citation omitted). Thus, "[e]ven if there is a statement that reflects a [retaliatory] attitude, it must have a nexus with the adverse employment action." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006) (citing Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999)). "To survive summary judgment on the basis of direct and indirect evidence, [plaintiff] must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action." Brinkley, 180 F.3d at 608 (citations omitted). "[I]n the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 300 (4th Cir. 2010) (citation omitted).

Where a Title VII plaintiff cannot proceed under a direct evidence theory, he must rely on the second avenue of proof: the pretext framework. In such cases, the plaintiff must

first establish a prima facie case of retaliation. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Waag v. Sotera Defense Sols., Inc., 857 F.3d 179, 191 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "differing factual situations," McDonnell Douglas, 411 U.S. at 802 n.13, the plaintiff in an employment discrimination suit is generally required to show that the employer took adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Under the McDonnell Douglas framework, once the plaintiff meets his initial burden of establishing a prima facie case for retaliation, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). Once the employer meets this burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "The final pretext inquiry merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination [or retaliation], which at all times remains with the plaintiff." Merritt, 601 F.3d at 294 (internal quotation marks and citation omitted).

B.    <u>Analysis</u>

HHS moves for summary judgment as to Maine's Title VII claims for retaliation and discrimination based on national origin and race. Maine's claims are premised on a number of purported adverse employment actions, which can be distilled into the following categories: (1) reassignment to GDC; (2) inadequate equipment, training, and other opportunities; (3) failure to promote; (4) disciplinary suspensions; (5) providing incomplete and inaccurate performance reviews; and (6) retaliatory hostile work environment. The Court addresses each category in turn.

1.    **Reassignment to GDC**

a.    **Adverse Employment Action**

To prevail on a Title VII claim, "the existence of some adverse employment action is required." <u>James v. Booz-Allen & Hamilton, Inc.</u>, 368 F.3d 371, 375 (4th Cir. 2004). Thus, before assessing Maine's discrimination and retaliation claims, the Court must first determine whether Maine's reassignment to GDC constitutes an adverse employment action.

For the purposes of a Title VII discrimination claim, an "adverse employment action" is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Hoyle v. Freightliner, LLC</u>, 650 F.3d 321, 337 (4th Cir. 2011) (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)). In other words, the plaintiff must show that the action "adversely affect[ed] the terms, conditions, or benefits of the plaintiff's employment." <u>Holland v. Wash. Homes,</u>

Inc., 487 F.3d 208, 219 (4th Cir. 2007) (quoting James, 368 F.3d at 375). Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999) (citation omitted); see also James, 368 F.3d at 376 (describing the circumstances under which a reassignment may constitute an adverse action for the purposes of a Title VII claim).

Relatedly, in the context of a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks and citations omitted). "[I]n determining what constitutes a materially adverse employment action, 'adversity for the purposes of Title VII's . . . discrimination proscription is a higher standard than adversity within the meaning of Title VII's retaliation provision.'" Lockley v. Town of Berwyn Heights, No. JFM-14-825, 2015 WL 5334256, at *11 (D.Md. Sept. 11, 2015) (quoting Westmoreland v. Prince George's Cnty., 876 F.Supp.2d 594, 605 (D.Md. 2012)).

In general, reassignments, transfers, or changes to an employee's job responsibilities without a decrease in pay are not adverse employment actions unless they have a "'significant detrimental effect' on his opportunities for promotion or professional development." James, 368 F.3d at 376 (quoting Boone, 178 F.3d at 256). Indeed, courts have found "that a new job assignment with reduced supervisory duties or diminished responsibility can constitute an adverse employment action." Fordyce v. Prince George's

29

Cnty., 43 F.Supp.3d 537, 548 (D.Md. 2014) (citation omitted). For instance, the court in Czekalski v. Peters, 475 F.3d 360 (D.C. Cir. 2007), noted that a lateral transfer could constitute an adverse employment action where the transfer results in the withdrawal of an employee's "supervisory duties" or "significantly different responsibilities." Id. at 364 (citations omitted). Additionally, in Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199 (2d Cir. 2006), the Second Circuit held that a transfer may constitute an adverse employment action when it causes a "radical change in [the] nature of the [plaintiff's] work." Id. at 206–07 (citations omitted). At the same time, however, "the mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." James, 368 F.3d at 376 (citation omitted).

Here, it is undisputed that Maine's reassignment from the management analyst position in Rockville to the contract specialist position at GDC did not affect his grade or pay. (See Am. Compl. ¶¶ 26–54, 91–96). Still, Maine has put forth evidence that his reassignment caused a "radical change" in his duties and responsibilities. See Kessler, 461 F.3d at 206. Maine "holds a Federal Acquisition Certification in Contracting (FAC-C) at Level III, and a Federal Acquisition Certification, Contracting Officer Representative (FAC-COR) at Level III," which "authorized [him] to formulate contracts, obligate funding, and bind the government in contracts up to one million dollars." (Decl. of Andrew Maine ["Maine Decl."] ¶ 9, ECF No. 10-1). Before his transfer to GDC, Maine was processing contracts worth up to $1 million "for goods and services that the NIH researchers needed for their research projects, such as contracts for unique lab specimens, or contracts with outside entities, such as universities, to provide research assistance." (Id.

¶ 8). As part of this role, Maine "would use [his] knowledge of the complicated regulatory scheme that governs federal contracting" and "ensur[e] that the contractor continued to meet the terms of the contract" after it was awarded. (Id.). By contrast, Maine's assignments at GDC were "limited to processing micro-purchase requisitions," which, at the time, were defined as "purchases up to $2,500." (Am. Compl. ¶ 32). Specifically, Maine was tasked with "purchasing routine, simple items that did not require any competition or follow up" such as "pens, printer cartridges, and petri dishes." (Maine Decl. ¶¶ 12, 13). According to Maine, "individuals who handle micro-purchases are generally lower graded employees," while Maine is a GS-13 employee. (Am. Compl. ¶ 32). Thus, Maine asserts that this change in duties "not only impacted [him] and [his] career goals, but [also] was a detriment to the NIH and the taxpayers, since [he] could not contribute [his] experience and skills to the Agency's mission." (Maine Decl. ¶ 11). Maine explains that "micro-purchases are not required to go through the complicated federal contracting competition process" and instead "can be processed and executed with no competition, minimal review, and mere price verification." (Am. Compl. ¶ 32). In other words, because processing of micro-purchases only requires a contract specialist to "determine if the items to be ordered are correct in quantity," (Opp'n at 34), micro-purchases are more "simplistic" and "menial" than larger value contract requisitions, (Am. Compl. ¶ 32). In addition to these changes, Maine also asserts that his reassignment to GDC isolated him from his immediate supervisor and the other members of his team, who continued to work from the Rockville office.

In response, HHS argues that Maine's "stated preferences for higher-dollar contracting" do not necessarily mean that his assignment to low-value contract work constitutes an adverse employment action. (Reply at 7). Of course, it is well established that "Title VII does not remedy everything that makes an employee unhappy." Jeffers v. Thompson, 264 F.Supp.2d 314, 349 (D.Md. 2003) (citation omitted). But this change to Maine's duties goes beyond his mere dissatisfaction with his new position at GDC. At bottom, Maine's transfer to GDC caused him to receive less complicated assignments which did not utilize his FAC-C and FAC-COR certifications, removed him from the office where he had worked for four years, and separated him from his teammates and supervisor, all while being denied the opportunity to continue working on a flex-time schedule as he had done when he worked in the Rockville office. Thus, Maine's new role at GDC decreased his level of responsibility and, as a result, likely diminished his opportunity for promotion. See Boone, 178 F.3d at 256–57. As such, a factfinder could reasonably determine that Maine's transfer to GDC had significant detrimental effect on his opportunities for promotion or professional development. See James, 368 F.3d at 376.

For these reasons, Maine has introduced sufficient evidence to create a genuine issue of material fact as to whether his transfer to GDC constituted an adverse employment action for the purposes of Title VII.  As set forth above, the standard for establishing an adverse employment action for the purposes of a discrimination claim is higher than the standard in the context of a retaliation claim. Thus, because the Court finds that Maine's reassignment may constitute an adverse employment action for the purposes of his

discrimination claim, it follows that a dispute of fact exists as to whether it was an adverse action for the purposes of his retaliation claim.

### b. Discrimination

Maine first contends that Goodger discriminated against him on account of his race and national origin by reassigning him to GDC. Because Maine proffers some direct evidence of Goodger's discriminatory animus, the Court will first consider whether Maine may proceed using this avenue of proof.

Maine contends there is direct evidence of Goodger's discriminatory bias against him because, shortly after meeting for the first time in August 2012, Goodger noticed Maine's "obvious accent" and asked Maine where he was from. (Am. Compl. ¶ 20). As a general matter, it is true that national origin discrimination may manifest itself through disdain for a plaintiff's accent. See EEOC v. Orkin Exterminating Co., 63 F.Supp.2d 684, 692 (D.Md. 1999) ("Discrimination based on manner of speaking can be national origin discrimination." (quoting Ang v. Procter & Gamble Co., 932 F.2d 540, 548 (6th Cir. 1991))). "The evidence must 'clearly indicate[ ] a discriminatory attitude at the workplace and must illustrate a nexus between the negative attitude and the employment action.'" Pilger v. D.M. Bowman, Inc., 833 F.Supp.2d 489, 494 (D.Md. 2011) (quoting Hill, 314 F.3d at 665), aff'd, 521 F. App'x 307 (4th Cir. 2013). Statements relating to a plaintiff's accent made as part of an explanation for an adverse employment action, for instance, may constitute direct evidence of discrimination. See In re Rodriguez, 487 F.3d 1001, 1005–06, 1008–09 (6th Cir. 2007) (finding direct evidence of discrimination from supervisor's statements that plaintiff did not get a promotion due to

concerns regarding plaintiff's "language," "how he speaks," and that plaintiff's "accent and speech pattern would adversely impact [plaintiff's] ability to rise through the company ranks").

Here, Goodger's inquiry about Maine's accent was not part of Goodger's explanation or justification for any alleged adverse employment action against Maine. Additionally, this conversation apparently took place more than a year before any of the purported adverse employment actions Maine alleges. Moreover, because there are several innocent and non-discriminatory justifications for asking a person where he is from based upon his "obvious accent," this statement does not rise to the level of a clearly discriminatory comment. For these reasons, this statement is insufficient to constitute direct evidence of any discriminatory bias against Maine by Goodger.

Having found that Maine cannot proceed under a direct evidence theory as to his discrimination claim, the Court next turns to the second avenue of proof: the pretext framework. In such cases, the plaintiff must first establish a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802. In order to establish a prima facie discrimination claim, the plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (citing White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004).

There is no dispute that Maine, who is Black and Jamaican, is a member of a protected class. There also does not appear to be a dispute that Maine exhibited satisfactory

job performance prior to his transfer to GDC. Indeed, Maine asserts that he received positive performance evaluations from 2009 through 2012. (See Maine Decl. ¶¶ 27–29; see also June 4, 2013 Email re: 2012 Performance Year, ECF No. 10-30 (recognizing "excellent performance during the 2012 performance year" and granting Maine "a Time-Off Award (TOA) of 10 hours"). Additionally, as discussed above, a reasonable jury could find that Maine's transfer to GDC constitutes an adverse employment action. Thus, the Court must only consider whether Maine has demonstrated he was treated differently from similarly situated employees outside the protected class.

Here, although Maine generally alleges that he was the only member of OLAO/OA Team 3 who was assigned to work at GDC, (Am. Compl. ¶ 33), he does not provide any information about the characteristics of these employees. Without this information, the Court is unable to infer that Goodger took an adverse action against Maine because of his national origin or race. See McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582, 586 (4th Cir. 2015). Because Maine fails to establish that he was treated differently than similarly situated employees outside the protected class, he has not set forth a prima facie case of discrimination.

In sum, Maine has failed to prove, either through direct evidence or the McDonnell Douglass burden-shifting framework, that Goodger discriminated against him by transferring him to GDC. Accordingly, HHS is entitled to judgment in its favor.

### c.    Retaliation

Maine also alleges that Goodger retaliated against him by assigning him to the contract specialist position GDC. In the context of this allegation, Maine offers some direct

evidence that Goodger's decision was motivated by retaliatory animus. Accordingly, the Court first considers whether Maine may proceed using this avenue of proof.

Maine alleges that, during a conference call in August 2012, "Goodger stated that he knew Mr. Maine had filed a previous EEO complaint, and that he was going to detail Mr. Maine, as a management right, to contracting specialist duties" at GDC. (Am. Compl. ¶ 22). Maine "objected to the detail to the warehouse, and informed Brian Goodger that he would exercise his right to file an EEO complaint if Goodger proceeded with the detail." (Id. ¶ 23). Shortly thereafter, "Goodger also told Mr. Maine that he did not like people who filed EEO complaints." (Id. ¶ 24).

HHS, for its part, argues that these statements do not constitute direct evidence of retaliatory animus because they are merely stray remarks. In general, stray remarks will not be deemed direct evidence of discrimination or retaliation. Lewis v. Home Sales Co., No. RDB 09-1153, 2011 WL 826352, at *4 (D.Md. 2011) (citation omitted); see also Rayyan v. Va. Dep't of Transp., 719 F.App'x 198, 203 (4th Cir. 2018) (finding that "two distasteful comments" were insufficient "evidence of a stated purpose to discriminate"). Goodger's statements, however, are more than just stray remarks—they go directly to Goodger's alleged retaliatory animus against Maine. Further, although Goodger's August 2012 statements were made nearly a year prior to Maine's reassignment, they nonetheless have a substantial nexus with the challenged employment decision because they were made in the context of Goodger's initial proposal to transfer Maine to GDC and Maine's opposition thereto. As such, the Court finds that these statements rise to the level of direct evidence of Goodger's retaliatory animus.

36

Having found that Maine may proceed under a direct evidence theory for his retaliation claim, the Court must next consider whether Maine has proven the element of causation. "In a direct evidence case, the plaintiff meets [his] ultimate burden . . . of providing 'but-for' evidence of causation, by showing that [he] would not have been subjected to the adverse employment action 'but for [his] employer's retaliatory animus.'" Smyth-Riding v. Scis. & Eng'g Servs., LLC, 699 F.App'x 146, 152 (4th Cir. 2017) (citing Foster, 787 F.3d at 252). In other words, Maine "bears the burden of establishing that unlawful retaliation 'would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" Netter, 908 F.3d at 938 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)).

For its part, HHS explains that Goodger transferred Maine to GDC not because of his prior EEO activity, but instead to help alleviate the warehouse's purchasing backlog and operating deficit. On July 18, 2013—the day Maine met with his supervisors to discuss his reassignment—Russell sent an email to Maine reiterating that his reassignment would "help eliminate the 3.5 million [dollar] deficit at the GDC." (July 18, 2013 Email re: Reassignment to GDC ["July 18, 2013 Email"], ECF No. 43-8). In his deposition during the EEO investigation, Goodger echoed this explanation, testifying that GDC "was $3 million in the red" and he "need[ed] more buyers" to process contracts. (June 5, 2015 Brian Goodger Dep. Excerpts ["June 5, 2015 Goodger Dep."] at 10:15–11:9, ECF No. 43-5). Goodger explained that he selected Maine for reassignment because he had "extensive 1102 [contract specialist] experience." (Id. at 11:12–13). Additionally, Maine had a light workload in his management analyst position at that time. (See Thomas Aff. at 3, ECF No.

37

43-6; see also July 18, 2013 Email). Further, Goodger explained that Maine needed to be relocated to GDC "to sit right with [the] customer and work with them throughout the cycle, the acquisition process, physically near each other." (June 5, 2015 Goodger Dep. at 19:11–19). According to Goodger, moving a contract specialist near his or her customer "enhances the volume . . . [and] gives the government a better value, better price." (Id. at 19:19–21). In addition, Goodger believes that requiring the contracting officer to sit with the customer "helps communication . . . [and] timeliness and results in a better contract." (Feb. 19, 2016 Brian Goodger Dep. Excerpts ["Feb. 19, 2016 Goodger Dep."] at 29:12–16, ECF No. 43-7).

Maine disputes the Agency's stated justifications for his reassignment to GDC. Despite Goodger's assertion that transferring Maine to GDC put him in close proximity to buyers, Maine explains that "[t]he requesters were not located in the warehouse; they were located throughout the NIH's large campus in Rockville, MD." (Maine Decl. ¶ 18). Thus, according to Maine, "[b]eing in the warehouse did not facilitate [his] communication with requesters, nor did it allow [him] to increase the volume of purchases [he] could process." (Id.). Maine also avers that he was "given few requisitions to process" during his time at the warehouse, including some weeks where he "had only a few requisitions to process per day." (Id. ¶ 21; see generally NBS PRISM Portal Pages, ECF No. 10-3 (reflecting several days on which Maine had as few as zero requisitions assigned to him)).

As for Goodger's statement that GDC was operating at a $3 million deficit, Maine explains: "If true, the deficit was caused by business decisions at NIH, and [was] not something that could be resolved by an employee processing more requisitions at the

warehouse." (Maine Decl. ¶ 22). Maine elaborates that NIH operated under a business model in which GDC "charges a mark-up to the requester that was higher than the wholesale price paid by the warehouse, but lower than the regular retail price," which resulted in a "win-win situation" where "the requesters received supplies at lower than retail prices, and the mark-up was intended to cover the costs of operating the warehouse." (Id. ¶ 23). Maine thus asserts that, if GDC was operating at a deficit, it "was because the warehouse was not charging a sufficient mark-up in prices to cover the operating expenses of the warehouse," not because of "an insufficient number of orders being processed." (Id. ¶¶ 24, 25). As Maine points out, "placing a higher graded employee such as [himself] in the warehouse could only contribute to the warehouse's deficit, since the warehouse processing work could have been handled by a lower graded, and therefore lower paid, employee." (Id. ¶ 26). Moreover, Maine contends that the purported deficit "could not be eliminated by warehouse employees processing more orders, or eliminating a backlog." (Id. ¶ 25).[9]

Maine's testimony calls into question the credibility of Goodger's stated reason for transferring him to GDC. Thus, in light of the evidence in the record, and considering it in the light most favorable to Maine, there exists a genuine dispute of material fact as to whether Maine's prior EEO activity was the but-for cause of Goodger's decision to transfer

---

[9] Maine also argues that if Goodger truly wanted Maine to assist in reducing the backlog, he would have promptly provided Maine with training in the NBS PRISM system. (See Opp'n at 9). As the Court explains in more detail below, it appears from the record that Maine's failure to receive appropriate training was due in large part to his own refusal to access the resources his supervisors provided to him. Thus, this argument does not support a finding that retaliation was the but-for cause of Maine's reassignment to GDC.

him to GDC. For this reason, Maine's Title VII retaliation claim as to his reassignment to GDC survives the Agency's motion for summary judgment.

### 2.    Inadequate training, equipment, and other opportunities

#### a.    Training, Computer, and Office at GDC

Maine alleges that, after his transfer to GDC, his supervisors "deliberately sabotaged any contribution [he] could have made" by refusing to provide him training in the NBS PRISM system, denying him a working computer, and placing him in an inadequate workspace. In general, denial of training opportunities does not constitute an adverse employment action for the purposes of a Title VII discrimination claim. See, e.g., Chika v. Planning Research Corp., 179 F.Supp.2d 575, 584 (D.Md. 2002) (claims of denied training opportunities "fail as a matter of law" since there is no evidence that the plaintiff suffered any adverse employment action). Likewise, an employee's placement in objectional physical office space with inadequate equipment does not constitute an adverse employment action. See Spriggs v. Public Serv. Comm'n of Md., 197 F.Supp.2d 388, 392–93 & n.6 (D.Md. 2002) (finding that placement in "objectionable offices" was not adverse employment action); Ward v. Johns Hopkins Univ., 861 F.Supp. 367, 377 (D.Md. 1994) (noting that less favorable assignments in the "dirtier" part of the basement was not an adverse action). Thus, Maine cannot establish a prima facie discrimination claim on these facts.

As for his retaliation claim, however, Maine must only "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination." <u>Burlington N.</u>, 548 U.S. at 68 (internal quotation marks and citation omitted). As such, the denial of training opportunities may form the basis of a retaliation claim where there is evidence that the training was required for the employee's professional development or that the employee was harmed by the denial. <u>See</u> <u>Allen v. Napolitano</u>, 774 F.Supp.2d 186, 204 (D.D.C. 2011) (noting that a plaintiff must show a change in her employment or "objectively tangible harm" as a result of not receiving the training).

Here, Maine repeatedly insists that he could not perform his assignments without receiving training on NBS PRISM because he had not worked with the system in four years and it had changed significantly during that time. (<u>See</u> Am. Compl. ¶ 36). In response, HHS provides evidence that the Agency did in fact provide Maine with the opportunity for training—indeed, Maine's supervisors informed him that he was to consult Carolyn Hayden-Kaplowitz, another contract specialist, for any help refreshing his memory on processing orders using NBS PRISM. (<u>See</u> Aug. 6–14, 2013 Emails from Russell, ECF No. 43-21). Despite this opportunity for informal training, Maine never sought Hayden-Kaplowitz's assistance and failed to participate in mandatory training sessions with her. (<u>See</u> Hayden Dep. at 28:8–22, ECF No. 43-22). Because the record shows that Maine turned down the opportunity for informal training, he cannot assert that he was tangibly harmed by the Agency's refusal to enroll him in a formal NBS PRISM training course.

As for Maine's assertion that his supervisors retaliated against him by failing to provide him a functional computer, this allegation is belied by evidence that Maine himself failed to take reasonable action to remedy the issue. Despite being instructed on August 1,

2013 to take his computer with him to GDC, Maine failed to do so. (See July 18, 2013 Email from Russell). When Maine informed Russell that he could not physically unlock the computer from his previous workstation, the agency promptly provided a loaner computer, which Russell observed on Maine's desk in September 2013. (See Aug. 1, 2013 Email from Russell, ECF No. 43-20; see also George Martinez Aff. ¶ 13(c), ECF No. 43-17). Thus, even if Maine's supervisors initially failed to provide him with a functional computer at GDC, the record reveals that Maine's computer troubles likely persisted because of his own actions. Accordingly, Maine's receipt of a faulty computer does not constitute a materially adverse action.

Finally, to the extent Maine argues that his supervisors placed him "in two hazardous work spaces with grossly substandard office space and equipment," these allegations also fall short of a materially adverse action. As a preliminary matter, an employee's placement in objectional physical office space with inadequate equipment does not constitute a materially adverse employment action. See Wonasue v. Univ. of Md. Alumni Ass'n, 984 F.Supp.2d 480, 492 (D.Md. 2013) (holding that "moving an employee to an inferior office or eliminating the employee's work station" does not constitute an adverse employment action in a retaliation claim (citation omitted)). Moreover, although Maine provides undated photographs of a scratched desk, sliding door track, a chair, and a laptop computer, he does not introduce any evidence that he promptly brought these concerns to the attention of his supervisors or that his supervisors were indifferent to his concerns. Rather, the record suggests that Russell was receptive to Maine's complaints and promptly arranged for accommodations. (See Feb.–May 2015 Emails re: Office Space &

Move, ECF No. 43-19). Indeed, the Agency later replaced his desk, repaired a ceiling tile, relocated the phone and internet jack, taped down any exposed cords, ordered a new filing cabinet, and eliminated the hissing or buzzing noise that Maine reported hearing. (See Gary Martinez Dep. Excerpts at 46:15–50:10, ECF No. 43-18). For these reasons, Maine cannot show that receiving a less-than-ideal workspace and equipment constitutes a materially adverse action.

In sum, the evidence regarding Maine's denial of training and inadequate equipment does not amount to an adverse action for the purposes of his Title VII discrimination claim. Additionally, Maine cannot rely on his complaints of inadequate training and equipment at GDC—which were perpetuated, in part, by his own actions—as the basis of his retaliation claim.[10] Accordingly, HHS is entitled to judgment in its favor.

### b.    Other Training Opportunities

Maine asserts that his supervisors retaliated and discriminated against him by denying his request for a "Simplified Acquisitions & Delegated Procurement" course in May 2016, rejecting his request for an "unlimited warrant application package" in July 2016, and denying him the opportunity to attend a "Leadership Excellence in Acquisitions" training in March 2017. (Am. Compl. ¶¶ 97, 105, 130).

---

[10] On this point, the Court notes that Maine introduced evidence that in June 2014, Goodger told Maine's coworker Joycelyn Bacchus that Maine was not getting the training he needed "[b]ecause he went to EEO." (Decl. of Joycelyn Bacchus ¶ 9, ECF No. 10-2). In that conversation, Goodger added that he "does not like losing EEO cases." (Id.). However, because Maine has not presented evidence sufficient to raise a dispute of material fact regarding whether his denial of training was a materially adverse action for the purposes of his retaliation claim, the Court need not consider whether these statements constitute direct evidence of Goodger's purported retaliatory animus.

In some instances, denial of professional development opportunities could be a materially adverse action. See Burlington N., 548 U.S. at 69 (2006) (noting that "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination"). Still, there must be evidence that the training is necessary for the employee's professional development such that denial of the training causes objectively tangible harm. See Jensen-Graf, 616 F.App'x at 598; see also Allen, 774 F.Supp.2d at 204 (dismissing retaliation claim based on refusal to authorize training courses when plaintiff failed to allege any significant change in her employment or objectively tangible harm).

Although Maine generally alleges that the Simplified Acquisitions & Delegated Procurement course was "an intricate part" of his "reintegration" into the contract specialist position at GDC, (Am. Compl. ¶ 103), he fails to explain precisely how this course was necessary for his professional development. Indeed, because Maine had been working at GDC for nearly three years at that point, it is unclear to the Court why this course would be required for Maine's "reintegration." Maine also fails to provide sufficient explanation regarding why the unlimited warrant application and leadership course were required for his professional development. Beyond that, HHS explains that Maine's supervisors denied these requests because the outside training courses exceeded the Agency's budget and Maine did not need an "unlimited warrant" to complete his assignments. (Reply at 19 & n.10).

Because Maine has not shown that denial of these opportunities constitutes an adverse employment action or a materially adverse action—and because, in any event,

HHS has provided a legitimate, nondiscriminatory reason for its decision—the Agency is entitled to judgment in its favor.

### c.     Flex-Time Schedule and Telework

Maine complains that his supervisors improperly denied his request for a flex-time schedule upon his assignment to GDC and later denied his request for telework. (Am. Compl. ¶¶ 89–90, 162). These decisions, however, do not constitute adverse or materially adverse employment actions. See Parsons v. Wynne, 221 F.App'x 197, 199 (4th Cir. 2007) (finding that employee's removal from an alternate work schedule would not have dissuaded a reasonable worker from making or supporting a charge of discrimination). Accordingly, HHS is entitled to judgment in its favor on this charge.

### 3.     Failure to Promote

### a.     2014 Vacancy

Maine contends that his non-selection for the 2014 job vacancy was the result of retaliation and discrimination. Because Maine does not present any direct evidence of retaliation or discrimination, the Court must determine whether Maine has set forth a prima facie case under the McDonnell Douglas framework.

### i.     Retaliation

To establish a prima facie retaliation claim, Maine must show "(1) that [he] engaged in protected activity, (2) that the employer took a materially adverse action against [him] and (3) there is a causal connection between the protected activity and the adverse action." See Evans v. Int'l Paper Co., 936 F.3d 183, 195 (4th Cir. 2019) (citations omitted). Here, the parties do not dispute that Maine engaged in protected activity when he filed EEO

complaints in 2008 and 2013. Further, it is undisputed that failure to promote constitutes an adverse employment action. See Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 544 (4th Cir. 2003) (stating that "[i]t has long been clear that failure to promote an employee constitutes an adverse employment action for the purposes" of Title VII (citations omitted)). Thus, the Court must only examine whether there is a sufficient causal connection between his protected activity and the challenged employment action.

Maine alleges that Goodger was aware of Maine's 2008 EEO complaint when he made the decision not to interview Maine for the 2014 job vacancy. (See Am. Compl. ¶ 22). Importantly, however, "[k]nowledge alone . . . does not establish a causal connection." Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004). There must also be "some degree of temporal proximity to suggest a causal connection." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005). As such, a "lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action" often "negates any inference that a causal connection exists between the two." Id. (internal quotation marks and citation omitted). Even "a lapse of as little as two months between the protected activity and an adverse employment action is sufficiently long so as to weaken significantly the inference of causation." Clarke v. DynCorp Int'l, 962 F.Supp.2d 781, 790 (D.Md. 2013) (internal quotation marks and citation omitted). Because several years passed between Maine's 2008 EEO complaint and Goodger's decision not to hire him for the 2014 promotion, the Court declines to infer that a causal link exists between the two events.

In addition to Maine's 2008 EEO activity, Maine also filed an EEO complaint in August 2013. (See Joint Mot. Ext. Time ¶ 3). Although this complaint is closer in time to his non-selection for the February 2014 promotion, Maine does not allege or otherwise show that Goodger was aware of the 2013 complaint at the time he made the adverse hiring decision. See Strothers v. City of Laurel, 895 F.3d 317, 336 (4th Cir. 2018) ("[N]o causal connection can exist between an employee's protected activity and an employer's adverse action if the employer was unaware of the activity."). Because Maine cannot show a causal connection between any of his EEO activity and his non-selection for the 2014 position, Maine has failed to establish a prima facie retaliatory failure-to-promote claim.

### ii.    Discrimination

As for his prima facie failure-to-promote claim on the basis of discrimination, Maine must show that: (1) he is a member of a protected class; (2) there was a specific position for which he applied; (3) he was qualified for that position; and (4) his employer rejected his application under circumstances that give rise to an inference of discrimination. See Bryant, 333 F.3d at 544–45 (citation omitted). There is no dispute that Maine, who is Black and Jamaican, is a member of a protected class; that Maine applied for the 2014 job opening; and that Maine was qualified for the position. Thus, the Court must only determine whether the circumstances of Goodger's hiring decision give rise to an inference of discrimination.

Maine argues that the circumstances here give rise to an inference of discrimination because Goodger declined to interview Maine for the position despite his placement in the top six candidates. HHS responds that Goodger's decision not to interview Maine is

47

irrelevant because Maine had worked under Goodger for eighteen months and Maine's performance was therefore well-known to Goodger by that time. While this may be so, the Agency's argument does not account for Maine's assertion that Goodger's offered various explanations for why he declined to interview Maine. First, Goodger stated that he interviewed the top four to six applicants based on the ratings and recommendations by Holliday and Marcotte; however, Maine was in the top six applicants based on scores, and Maine even received Marcotte's recommendation for a second interview. (Am. Compl. ¶¶ 79, 80, 82). According to Maine, Goodger later stated he only had Holliday and Marcotte do the first round of interviews "to get their scores and thoughts, not to determine who should be interviewed in the second round." (Id. ¶ 81). Goodger subsequently explained that he did not interview Maine because he met with Holliday after the initial interviews, at which time Holliday said he did not concur with Marcotte's recommendation for Maine to receive a second interview. (Id. ¶ 83). At another point, Goodger said that he did not interview Maine because he did not think he was capable of performing the job. (Id. ¶ 84). As a general principle, a supervisor's changing explanation for a particular action can give rise to an inference of discrimination. Cf. Reeves, 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). Accordingly, the Court finds that Maine has adequately established the fourth element of a prima facie discriminatory failure-to-promote claim.

Because Maine has established a prima facie case of employment discrimination, the burden shifts to HHS to provide a legitimate non-discriminatory reason for its decision.

HHS has done so here: Goodger did not hire Maine because Cortes-Shrank was the most qualified candidate. Cortes-Shrank had nearly five years of experience as a GS-14, whereas Maine was a GS-13. (Compare Justification for Selection of Cortes-Shrank at 1, ECF No. 43-47 with Maine Resume at 1–7, ECF No. 10-33). In her prior position, Cortes-Shank was responsible for providing guidance and mentoring for other contract specialists, and such experience was directly relevant to the vacant supervisory position. (See Justification for Selection of Cortes-Shrank at 1). Further, Cortes-Shrank's educational background was superior—she held a master's degree, whereas Maine was still pursuing one. (Compare id. with Maine Resume at 7). Cortes-Shrank also held an unlimited contracting warrant. (Justification for Selection of Cortes-Shrank at 1). At bottom, Maine's assertion that "[his] qualifications were plainly superior" to Cortes-Shrank's, (Am. Compl. ¶ 77), is inconsistent with the record evidence.

For his part, Maine responds that the Agency's proffered justification is pretextual because the job vacancy was not advertised with a veterans' preference. Additionally, Maine argues that Goodger lacks credibility because it was Goodger who "had deliberately undermined [Maine's] candidacy, at the time of his first round interview, by depriving him of a working computer and the training that he needed to perform his new job effectively." (Opp'n at 18). These arguments fall short. First, although the vacancy was not announced with veterans' preference, it was lawfully advertised under the Agency's direct hire authority and merit promotion procedures. (See 2014 Job Posting, ECF No. 12-5); see also Burroughs v. Dep't of Army, 446 F.App'x 278, 281–82 (Fed. Cir. 2011) (affirming that agency does not violate veterans' preference laws by issuing a vacancy announcement

under merit promotion procedures). Accordingly, Maine was not entitled to any additional preference, and HHS's failure to utilize the veterans' preference procedure does not constitute evidence of pretext. Further, as discussed above, any effects of Maine's faulty equipment or lack of training after his arrival at GDC were in part due to his own failure to report the issues to his supervisors or to make use of the informal training that was available to him. Lastly, Maine does not explain how he was more qualified than Cortes-Shrank, and therefore cannot avoid the fact that relative employee qualifications "are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Evans, 80 F.3d at 960 (citations omitted). As such, Maine cannot demonstrate that the Agency's justification is pretextual.

In sum, HHS has established a legitimate, nondiscriminatory reason for declining to select Maine for the 2014 job vacancy, and Maine has not introduced sufficient evidence to show that the Agency's stated reason is pretextual. For these reasons, HHS is entitled to judgment in its favor.

### b.   2017 & 2018 Positions

Maine also alleges that his non-selection for the GS-1101-14 job announcements in 2017 and 2018 constitutes retaliation and discrimination under Title VII. The Court evaluates these claims under the McDonnell Douglas framework.

For the purposes of Maine's retaliation claim, the Court presumes that Maine believes these adverse employment decisions were in retaliation for his August 2016 EEO complaint, which he amended through April 2017. (See Am. Compl. ¶¶ 109–11). Although the 2017 non-selection is temporally close to Maine's 2017 EEO activity, his claim

nonetheless fails. First, mere temporal proximity is not necessarily enough to create a jury issue as to causation. Indeed, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006) (citations omitted).

By the time the 2017 and 2018 vacancies were announced, Maine had amassed a well-documented history of disciplinary suspensions and poor performance evaluations. Because issues with Maine's job performance had arisen gradually prior to his 2016 and 2017 EEO activity, his failure to be selected for the 2017 and 2018 job openings does not give rise to an inference of retaliation. In addition, because Maine fails to identify the hiring decisionmakers for the 2017 and 2018 positions, he cannot show that they knew about his protected activity and that they took the adverse employment actions against him shortly after becoming aware of such activity. See Strothers, 895 F.3d at 336. For these reasons, Maine has not set forth a prima facie retaliatory failure-to-promote claim for the 2017 or 2018 job openings, and HHS is entitled to judgment in its favor.

Maine also states that his non-selection for the 2017 and 2018 job positions constitutes discrimination under Title VII. Once again, Maine fails to establish that he was qualified for the positions or provide any facts that would give rise to an inference that his non-selection was due to his race or national origin. Additionally, Maine cannot establish a prima facie case for the 2017 vacancy because no one was ultimately selected for the position. See Bowie v. Ashcroft, 283 F.Supp.2d 25, 31 (D.D.C. 2003) ("When a government agency cancels a vacancy announcement and no one outside the protected

class is hired to fill the position, the plaintiff cannot establish [a] prima facie case . . . ." (citations omitted)); <u>Fornah v. Univ. of Md.</u>, No. CBD-08-1951, 2009 WL 3247423, at *5 (D.Md. Sept. 30, 2009) ("Plaintiff cannot make a prima facie case for discrimination because Defendant cancelled the search for [the job vacancy] . . . ."). As to the 2018 position, Maine cannot set forth a prima facie case that he suffered discrimination on account of his national origin or race because the Agency ultimate hired Sharmaine Fagan-Kerr, who is Jamaican. (Cortes-Shrank Aff. ¶ 36, ECF No. 43-43); <u>see also</u> <u>Miles v. Dell, Inc.</u>, 429 F.3d 480, 488 (4th Cir. 2005) ("[W]hen someone within [plaintiff's] protected class is hired . . . that fact ordinarily gives rise to an inference that the defendant did not [discriminate against plaintiff] because of her protected status."). Accordingly, Maine has not set forth a prima facie discriminatory failure-to-promote claim for the 2017 or 2018 job openings, and HHS is once again entitled to judgment in its favor.

### c.   Transfer to NITAAC

Maine alleges that Goodger retaliated and discriminated against him by denying his request for reassignment to the NITAAC in March 2017. In the context of these allegations, Maine explains that his "qualifications . . . [were] equal to, or exceed[ed] those of most employees occupying" contract specialist positions at NITAAC and "Eric Chapman, a comparably placed employee of the simplified acquisition team . . . had been allowed many reassignment opportunities." (Am. Compl. ¶¶ 134–35). According to Maine, Chapman has thus "been able to continue his fast-paced growth track, and has been given the opportunity to receive more rewarding and higher-skilled assignments." (<u>Id.</u> ¶ 136).

Aside from Maine's bare-bones allegations that he is more qualified than other contract specialists who currently work at NITAAC, he fails to provide any facts establishing that he applied for a particular position at NITAAC and was actually qualified for the position. Additionally, although Maine attempts to identify Chapman as a comparator, he does not provide any information regarding Chapman's status as a member outside of the protected class. Further, to the extent that Maine believes this action was the result of retaliation, Maine fails to provide any evidence of a causal link between his EEO activity and Goodger's decision. Indeed, because issues with Maine's job performance had arisen gradually prior to his 2016 and 2017 EEO activity, Goodger's decision to deny Maine's transfer request does not give rise to an inference of retaliation.

For these reasons, Maine has not set forth a prima facie discrimination or retaliation claim as to his 2017 request for reassignment, and the Agency is entitled to judgment in its favor.

### 4.      Disciplinary Suspensions

Maine next argues that his supervisors retaliated and discriminated against him by designating him as AWOL, issuing him a letter of reprimand, and imposing a seven-day suspension and two fourteen-day suspensions against him. Because Maine does not introduce any direct evidence of retaliation or discrimination as to these claims, the Court will proceed under the McDonnell Douglas framework.

As a preliminary matter, Maine's AWOL status and the letter of reprimand do not constitute adverse actions because they did not result in a loss of pay. See Wonasue, 984 F.Supp.2d at 492 (explaining that considering an employee AWOL is not an adverse

action). By contrast, it is well-established that unpaid suspensions rise to the level of adverse employment actions. See Allen v. Rumsfeld, 273 F.Supp.2d 695, 705–06 (D.Md. 2003) (finding that a ten-day unpaid suspension was an adverse action); Parkinson v. Anne Arundel Med. Ctr., Inc., 214 F.Supp.2d 511, 518 (D.Md. 2002) (noting that one-day, unpaid suspension could qualify as an adverse employment action (citing Spriggs v. Diamond Auto Glass, 242 F.3d 179, 190 (4th Cir. 2001))). Accordingly, the Court will confine its analysis to Maine's disciplinary suspensions.

To set forth a prima facie case of discriminatory discipline, a plaintiff must demonstrate that he engaged in prohibited conduct similar to that of one outside of his protected class and was disciplined more severely than the other individual. See Purchase v. Astrue, 324 F.App'x 239, 242 (4th Cir. 2009). In other words, the plaintiff must show that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and the disciplinary measures enforced against him were more severe than those enforced against other employees. See Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993) (citation omitted).

When assessing misconduct, "precise equivalence in culpability between employees is not the ultimate question." Moore v. City of Charlotte, 754 F.2d 1100, 1107 (4th Cir. 1985) (citation omitted). Instead, a comparison of the relative severity of employees' misconduct can be made "in light of the harm caused or threatened to the victim or society, and the culpability of the offender." Id. (citation omitted). Nevertheless, while any comparison "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances," Cook, 988 F.2d

54

at 511 (citation omitted), "the similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful," Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008) (citation omitted).

Here, Maine alleges that he received a fourteen-day suspension for sending emails outside his chain of command while "Robert Coen, a white male with no prior EEO activity who was the Director of NITAAC in OLAO, and who reported to Brian Goodger, was given only a three-day suspension for theft of Agency funds." (Am. Compl. ¶ 63). Indeed, Goodger testified that he recommended a three-day suspension for Coen due to "some irregularities with his travel reimbursement forms" that suggested "he was skimming off of the top, so to speak." (June 5, 2015 Goodger Dep. at 68:10–15; see also Feb. 19, 2016 Goodger Dep. at 24:7–18). Goodger also required Coen to pay back the missing funds. (June 5, 2015 Goodger Dep. at 68:16–20).

Although Coen is an employee outside of the protected class who was disciplined less severely for a work-related offense, the Court cannot say the "seriousness" of Coen's offense is "clearly established." See Lightner, 545 F.3d at 265. At the outset, it is difficult to determine the exact nature of Coen's offense based on the evidence in the record. For example, while Goodger's comment that Coen was "skimming off of the top" suggests intentional conduct, his characterization of the offense as mere "irregularities" with travel reimbursement forms could suggest that Coen's conduct was inadvertent. Beyond this testimony, Maine does not point to any evidence regarding the circumstances of the offense, including the amount that was stolen, the scope of Coen's improper conduct, or any other context of the purported theft. Additionally, Maine does not make any suggestion

that Coen had a history of misconduct or had received previous reprimands. See Sook Yoon v. Sebelius, 481 F.App'x 848, 850 (4th Cir. 2012) (noting that work history is a relevant factor in determining comparability (citation omitted)). Indeed, Goodger also indicated that, to his knowledge, it was Coen's first offense. (June 5, 2015 Goodger Dep. at 69:4–5; Feb. 19, 2016 Goodger Dep. at 24:12–14). Without details regarding the context of the offense or Coen's employment record, the Court cannot adequately compare the relative severity of the misconduct. Thus, Maine fails to establish a prima facie case of discriminatory discipline.

As for his retaliation claim, Maine must establish a prima facie case by showing "(1) that [he] engaged in protected activity, (2) that the employer took a materially adverse action against [him] and (3) there is a causal connection between the protected activity and the adverse action." Int'l Paper, 936 F.3d at 195. The first and second elements are not in dispute—Maine engaged in repeated EEO activity and unpaid suspensions are materially adverse actions for the purpose of a Title VII claim. Maine fails, however, to establish a causal link between his protected activity and the disciplinary actions against him. Although Maine filed an EEO complaint in August 2013—shortly before Russell issued a letter of reprimand against Maine in September 2013—Maine does not provide any evidence that Russell was aware of Maine's August 2013 EEO complaint. Likewise, Maine has not proven that Russell was aware of his August 2013 or August 2014 EEO activity prior to his disciplinary suspensions in 2014 and 2015. As such, Maine apparently asks the Court to infer that Russell instituted these disciplinary actions against Maine in 2013 as retaliation for his 2008 EEO complaint. As noted above, however, a "lengthy time lapse

between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action" often "negates any inference that a causal connection exists between the two." Constantine, 411 F.3d at 501 (citation omitted). Given the length of time between Maine's 2008 EEO complaint and the disciplinary actions against him in 2013 through 2015, Maine cannot show a causal connection sufficient to establish a prima facie retaliation case.

Even if Maine could set forth a prima facie claim for discriminatory or retaliatory discipline, his claims would still fail under the McDonnell Douglas burden-shifting framework because HHS offers a legitimate, non-retaliatory reason for its actions. Pursuant to NIH procedures, a letter of reprimand is the lowest level of formal discipline, followed in severity by a suspension without pay. (See NIH Table of Penalties at 1, ECF No. 43-24). For a charge of "failure to follow instructions," NIH's guidance suggests that a first action results in discipline from a reprimand to five-day suspension; a second action would result in a seven to thirty-day suspension; and a third action would lead to a fourteen-day suspension up to removal. (Id.).

On August 2, 2013, Russell issued a "Letter of Warning" after Maine failed to attend the May 2013 Financial Report meeting on June 28, 2013 per Russell's instructions. (Aug. 2, 2013 Warning Letter at 1, ECF No. 43-25; see also Russell Aff. ¶ 22, ECF No. 43-4). On September 30, 2013, Russell issued an "Official Letter of Reprimand" after Maine, among other things, failed to comply with Russell's instructions to shadow another employee GDC; refused to provide evidence of a service request for his computer; and openly questioned Russell's whereabouts, leave type, decisions, and judgments when

addressing his own unexcused absences. (Sept. 30, 2013 Reprimand at 1–2, ECF No. 43-26). In February 2014, Russell issued a notice of a proposed suspension for seven days for failure to follow supervisory instructions after Maine failed to complete an annual ethics training despite receiving several emails directing him to do so. (Feb. 12, 2014 Proposed Suspension at 1–5, ECF No. 43-29); see also Email re: Ethics Training at 1–5, ECF No. 43-27). The seven-day suspension was later upheld by Goodger. (See Mar. 21, 2014 Decision re: Suspension, ECF No. 43-30). In August 2014, Russell proposed a fourteen-day suspension after Maine failed to follow her instructions to process his assigned requisitions over a period of several months. (Aug. 12, 2014 Proposed Suspension, ECF No. 43-31). Goodger also upheld this suspension. (Dec. 12, 2014 Decision re: Suspension, ECF No. 43-32).

Additionally, Russell informed Maine in April 2014 that he should direct his questions and concerns within his chain-of-command, and that he should cease including the human resources director on his correspondence. (Apr. 11, 2014 Email, ECF No. 43-33). Goodger also specifically instructed Maine not to include the director on any email chains. (July 31, 2015 Email Chain at 1, ECF No. 43-34). On August 4, 2015, Russell gave Maine a "direct order to cease and desist emailing individuals that are not in [his] present 'Chain of Command or Designee,'" advising him that failure to follow this directive may result in disciplinary action. (Id. at 5). Later that day, however, Maine included the director on email chains despite these express instructions. (Id. at 2–3). As a result, on August 28, 2015, Russell issued Maine a second proposed fourteen-day suspension for failure to

follow instructions, which was again upheld by Goodger. (Aug. 28, 2015 Proposed Suspension, ECF No. 43-35; Oct. 6, 2015 Decision re: Suspension, ECF No. 43-36).

Maine attempts to cast blame for his first two suspensions—i.e., his suspensions for failing to complete the ethics training and process his assigned acquisitions—on his supervisors' failure to provide him a working computer and refusal to provide training in the NBS PRISM system. These explanations fall short. The record shows that Maine was supplied a loaner laptop on August 1, 2013, which afforded him access to the internet and his NIH email account in order to timely complete the ethics training. Additionally, the Agency made another GDC employee available as a resource for assistance with the NBS PRISM system, but Maine refused her help because he questioned whether she had sufficient "background knowledge" to train him. Thus, Maine fails to show that the Agency's explanation for his first and second disciplinary suspensions is pretextual.

As for his third suspension, Maine suggests that the punishment was improper because he was entitled to contact the Agency's human resources director on matters relating to his performance plan, which he contends "was being mishandled" by his supervisors. (Opp'n at 14). Regardless of Maine's view, however, his supervisors had instructed him that he should not send emails outside of his chain-of-command; thus, it was within his supervisors' authority to suspend him for violating a direct order. Even where it appears a supervisor "overreacted to the multiple complaints regarding [the plaintiff's] behavior," Amirmokri v. Abraham, 437 F.Supp.2d 414, 424 (D.Md. 2006), aff'd, 266 F.App'x 274 (4th Cir. 2008), a court should not "sit as a kind of super-personnel department weighing the prudence of employment decisions made by [employers] charged

with employment discrimination," DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted). Accordingly, Maine cannot show that the Agency's stated justification is pretextual.

As the record shows, the Agency's progressive disciplinary actions against Maine were a result of repeated episodes of insubordination and, in terms of severity, fell within the range of NIH's table of penalties. Moreover, despite his disagreement with his supervisor's decisions, Maine does not deny that he committed the charged conduct. In sum, HHS has satisfied its burden under McDonnell Douglas to establish a legitimate, nondiscriminatory reason for its disciplinary actions against Maine, and Maine has failed to show that this reason is pretextual. Accordingly, the Court will enter judgment in favor of HHS.

**5.     Incomplete or inaccurate performance reviews**

Maine next argues that Russell, Holliday, and Cortes-Shrank retaliated and discriminated against him by giving him inaccurate or incomplete performance reviews. Once again, the Court will evaluate these claims under the McDonnell Douglas framework.

At the outset, courts generally find that poor performance evaluations do not rise to the level of adverse or materially adverse employment actions. See, e.g., Bryant v. McAleenan, No. ELH-18-1183, 2019 WL 4038565, at *19 (D.Md. Aug. 27, 2019) (concluding that a "poor performance evaluation on [plaintiff's] mid-year assessment" was insufficient to give rise to a retaliation claim), aff'd sub nom. Bryant v. Wolf, 785 F.App'x 130 (4th Cir. 2019). A downgrade of a performance evaluation could constitute an adverse action, however, if it has a tangible effect on the terms, conditions, or benefits of

employment. See James, 368 F.3d at 377. Put differently, a poor performance evaluation "is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." Id. (quoting Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000)). Thus, "[a]n evaluation merely causing a loss of prestige or status is not actionable." James, 368 F.3d 377 (quoting Cossette v. Minn. Power & Light, 188 F.3d 964, 972 (8th Cir. 1999)).

Here, Maine alleges that Russell failed to give him a "closeout" PMAP rating for his previous position after his reassignment to GDC; issued "generic" PMAPs with "irregularities" in 2013; and delivered his 2014 PMAP three months late without meeting with him to discuss. (See Am. Compl. ¶¶ 65–67, 69). Maine therefore appears to challenge not the substance of these evaluations, but rather the manner in which the performance evaluations were issued. The Court is not aware, however, of any cases suggesting that a supervisor's failure to follow certain employee evaluation procedures rises to the level of an adverse employment action. And in any event, Maine does not explain how these deficiencies affected the terms and conditions of his employment. Accordingly, these allegations do not support Maine's Title VII claims.

As for his 2014 PMAP, Maine complains that Russell gave him a "negative progress review" that incorrectly indicated "he had refused to take necessary training and had failed to process GDC requisitions." (See Am. Compl. ¶¶ 68–70). Maine also alleges that it was inappropriate for Holliday to complete Maine's 2016 PMAP because Holliday became Maine's supervisor with "only two months remain[ing] in the 2016 rating period" and therefore was "clearly unfamiliar" with Maine's accomplishments. (Id. ¶ 127). Maine also

complains that Cortes-Shrank "[d]eliver[ed] Mr. Maine's 2018 Mid-Year Report on the floor of the warehouse," during which she made "false allegations against him" and "[his] work product" within earshot of other employees. (Id. ¶ 187). Specifically, Maine alleges that Cortes-Shrank falsely asserted he "was not working independently," which he explains can be disproven through his "email correspondence with Cortes-Shrank, as well as by his work product." (Id. ¶ 138). Maine also states that she refused to answer his questions or "provide documentation with respect to her attacks upon him and upon his work product." (Id. ¶¶ 138–40).

Maine asserts that these negative performance evaluations "resulted in Mr. Maine's losing his expected within-grade salary increase for 2015" and "led to the denial of his within grade increase" for subsequent years. (Id. ¶¶ 70, 186, 187, 190, 192). As HHS points out, however, Maine was only eligible for periodic step increases every two years. See 5 U.S.C. § 5335(a). Maine received his increase to a GS-13, Step 6 in January 2016, and was advanced to Step 7 in 2018. (SF-50 Notifications of Personnel Action, ECF No. 43-59). Because Maine received within-grade increases, Maine cannot demonstrate that his supervisors used the negative "evaluation[s] as a basis to detrimentally alter the terms or conditions" of his employment.[11] See Spears, 210 F.3d at 854. Accordingly, Maine's negative performance reviews do not constitute an adverse employment action for the purposes of Title VII.

---

[11] Moreover, because Maine failed to challenge the alleged denial of within-grade increases in his EEO complaints, he has failed to exhaust his administrative remedies for these claims. See 42 U.S.C. § 2000e-16; Laber v. Harvey, 438 F.3d 415–16 (4th Cir. 2006) (en banc).

Separately, Maine also states that he "should have been rated Exceptional/Outstanding in every category." (Am. Compl. ¶ 127). Despite this assertion, Maine fails to introduce any evidence that "the evaluation[s] contained falsehoods, as opposed to mere disagreements over his performance." James, 368 F.3d at 378. In fact, the record shows that Maine's low performance evaluations accurately reflected his unsatisfactory performance. First, Maine failed to process a single requisition between August 2013 and December 2014. (See Requisition Chart, ECF No. 43-23). As described above, Maine was disciplined on several occasions between 2013 and 2015 for failure to follow his supervisors' direct orders and instructions. Further, Maine's low performance review for 2018 was due to his supervisor's observation that Maine "did not perform enough work compared to other similarly-situated employee[s];" [t]he other employees did at least [600–700] purchase orders during the year, but [Maine] did less than 200"; Maine "doesn't want to take any cases over $3500"; and "other employees . . . have to take on [Maine's] work when he doesn't complete his." (See Cortes-Shrank Aff. ¶ 27; Suppl. Cortes-Shrank Aff. ¶ 27, ECF No. 43-45). In sum, because there is no evidence that Maine's dissatisfaction with his performance reviews goes beyond mere disagreement with his supervisors, they cannot form the basis for his claims of retaliation or discrimination. See James, 368 F.3d at 378; see also Thorn v. Sebelius, 766 F.Supp.2d 585, 601 (D.Md. 2011) ("[I]nstances where [plaintiff] disagreed with the management style or decisions of those who supervised him . . . alone [are] not actionable under Title VII." (citation omitted)), aff'd, 465 F.App'x 274 (4th Cir. 2012); Allen v. Baltimore Cnty., No. L-01-863, 2002 WL 32325675, at *3 (D.Md. Sept. 17, 2002) ("A plaintiff cannot establish a Title VII

claim based solely on disagreements with workplace decisions." (citing <u>DeJarnette</u>, 133 F.3d at 299)), <u>aff'd</u>, 61 F.App'x 69 (4th Cir. 2003). Accordingly, HHS is entitled to judgment in its favor.

### 6.    Retaliatory Hostile Work Environment

Finally, Maine asserts that Cortes-Shrank and Holliday created a retaliatory hostile work environment.[12] In general, the "adverse employment action" requirement of a Title VII retaliation claim may be satisfied by establishing a hostile work environment. <u>See</u> <u>Von Gunten v. Maryland</u>, 243 F.3d 858, 869 (4th Cir. 2001) ("Retaliatory harassment can constitute [an] adverse employment action."), <u>abrogated on other grounds by</u> <u>Burlington N.</u>, 548 U.S. at 67–68. A hostile work environment amounts to actionable retaliation only if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N.</u>, 548 U.S. at 68 (internal quotation marks and citation omitted). Thus, although "Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct," <u>Thompson v. N. Am. Stainless, LP</u>, 562 U.S. 170, 173 (2011), not every uncomfortable moment in the workplace will constitute an adverse action. Indeed, "[a]n employee's decision to report discriminatory behavior cannot

---

[12] Although Maine's Amended Complaint does not style any of his claims in this manner, he notes generally in his Opposition that he intends to bring a claim for "hostile work environment." (Opp'n at 30). Because the Court has determined that HHS demonstrated a legitimate reason for many of the other purported adverse actions against Maine, the Court will not consider these actions for the purposes of his hostile work environment claim, and will instead limit its analysis to Maine's allegations against Cortes-Shrank and Holliday.

immunize that employee from those petty slights and minor annoyances that often take place at work." Burlington N., 548 U.S. at 68.

Maine first complains that Cortes-Shrank "scream[ed]" and "hurl[ed] invectives at him" during his 2018 performance evaluation. (Am. Compl. ¶ 187). Further, Maine asserts that Cortes-Shrank "blurted out" "at the top of her lungs" that she was only giving Maine "a rating of three." (Id. ¶ 142). In most circumstances, however, making disparaging remarks or even yelling does not typically rise to the level of an adverse employment action. See Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 243 (4th Cir. 1997) (holding that an employer's "yelling at [the plaintiff] during [a] meeting" did not rise to the level of an adverse employment action); Smith v. Vilsack, 832 F.Supp.2d 573, 583 & n.9 (D.Md. 2011) (collecting cases holding that an oral or written reprimand is only an adverse action if it works a real, rather than speculative, injury, and noting, "as a general matter, disparaging remarks made by a supervisor do not state an adverse employment action" (internal quotation marks and citation omitted)). Thus, Cortes-Shrank's purported "constant abuse and invective" against Maine does not rise to the level of an adverse employment action.

Maine also asserts that Cortes-Shrank and Holliday created a hostile work environment by openly discussing his previous EEO complaint with him during an October 2018 meeting. (See Am. Compl. ¶¶ 143–45, 187). As to Holliday individually, Maine alleges that Holliday "contributed to the retaliation" by Cortes-Shrank when he failed to give Maine "proper work assignments." (Id. ¶ 187). Further, Maine appears to assert that Holliday's placement as Maine's supervisor in November 2016 was inherently retaliatory

because Holliday "had sired a child with Russell," and Maine had previously filed EEO complaints against both Russell and Holliday. (Id. ¶¶ 111, 192).

Fundamentally, these events amount to nothing more than instances where Maine disagreed with the management style or decisions of those that supervised him, which on their own are not actionable under Title VII. See Thorn, 766 F.Supp.2d at 601 ("[C]omplaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII." (quoting EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315–16 (4th Cir. 2008))). Taking these events together, Cortes-Shrank's and Holliday's actions against Maine were not sufficiently severe as to dissuade a reasonable employee from engaging in protected activity. Accordingly, HHS is entitled to judgment in its favor.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part HHS's Motion to Dismiss Amended Complaint or, in the Alternative, for Summary Judgment (ECF No. 43), which it construes as a motion for summary judgment. A separate Order follows.

Entered this 16th day of August, 2021.

_____/s/_____
George L. Russell, III
United States District Judge